INSTITUTE FOR FREE SPEECH
Alan Gura, SBN 178221
    Designated counsel for service, LR 182(c)
    agura@ifs.org
Courtney Corbello (pro hac vice pending)
    ccorbello@ifs.org
1150 Connecticut Avenue, N.W., Suite 801
Washington, DC 20036
Phone: 202.967.0007
Fax:    202.301.3399

Attorneys for Plaintiff Daymon Johnson

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DAYMON JOHNSON, | Case No.: |
| *Plaintiff,* | COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF |
| v. | |
| STEVE WATKIN, in his official capacity as Interim President, Bakersfield College; RICHARD McCROW, in his official capacity as Dean of Instruction, Bakersfield College; THOMAS BURKE, in his official capacity as Chancellor, Kern Community College District; ROMEO AGBALOG, in his official capacity as President, Kern Community College District Board of Trustees; JOHN S. CORKINS, in his official capacity as Vice President, Kern Community College District Board of Trustees; KAY S. MEEK, in her official capacity as Clerk, Kern Community College District Board of Trustees; KYLE CARTER, in his official capacity as Trustee, Kern Community College District; CHRISTINA SCRIVNER, in her official capacity as Trustee, Kern Community College District; NAN GOMEZ-HEITZEBERG, in her official capacity as Trustee, Kern Community College District; and YOVANI JIMENEZ, in his official capacity as Trustee, Kern Community College District, | |
| *Defendants.* | |

JURISDICTION

1.   The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343, as Plaintiff alleges that Defendants are violating 42 U.S.C. § 1983 by depriving him, under color of state law, of rights, privileges, and immunities secured by the First and Fourteenth Amendments to the United States Constitution.

VENUE

2.   This Court is the proper venue for this action per 28 U.S.C. § 1391(b) as a substantial part of the events and omissions giving rise to the claim have occurred and are occurring in this judicial district.

INTRODUCTION

3.   "They're in that five percent that we have to continue to cull. Got them in my livestock operation and that's why we put a rope on some of them and take them to the slaughterhouse. That's a fact of life with human nature and so forth, I don't know how to say it any clearer."[1]

4.   The five percent that Defendant John Corkins referred to are faculty of Bakersfield College. They must be slaughtered, so to speak, for transgressions including the writing of op-eds in the local newspaper, appearances on radio programs, and the failure to censor their colleagues' Facebook posts, all in opposition to the school's official ideology. The first "cullee," Professor Matthew Garrett, has just been fired for these forms of pure political speech.

5.   Unlike Corkins's livestock, the faculty he oversees as Vice President of the Kern Community College District's Board of Trustees understand the sort of operations he and his Defendant colleagues run. They know what happened to their friend who is no longer there, and why.

6.   Plaintiff Daymon Johnson has special reason to be concerned about his future as a Bakersfield College professor should he continue to express his views. Johnson is Garrett's successor as the Faculty Lead for the Renegade Institute for Liberty ("RIFL"), the dissident group villainized by the school administration. The new leader of the "five percent," Professor Johnson

---

[1] John Corkins, *December 2022 Board of Trustees Meeting (12/13/2022)*, YouTube, https://perma.cc/L7JY-4HJR (last visited May 24, 2023).

also authored several Facebook posts whose non-deletion by Garrett featured in the charges of wrongthink for which the latter was fired.

7.    Indeed, Bakersfield College has already subjected Professor Johnson to a lengthy and intrusive investigation merely for criticizing and questioning a colleague's views on RIFL's Facebook page. Although it ultimately cleared Professor Johnson of violating any actual rules, the process was the punishment. The investigation forced Professor Johnson to retain counsel, and the school's ten-page single-spaced findings sustained or found plausible various "allegations" that Professor Johnson had expressed himself, perhaps motivated by political disagreement.

8.    Moreover, then-Bakersfield College President Zav Dadabhoy called out Professor Johnson's institute as "a small group promoting exclusion," contrary to the school's official state-mandated ideology holding that school personnel "must intentionally practice" and "understand" the tenets of "anti-racism," 5 Cal. Code Regs. § 51201(b). Professor Johnson, however, believes it is the school's official ideology, not his, that promotes exclusion.

9.    Given school officials' various ideological proclamations, his experience of being investigated for pure political speech, and the example Defendants made of his colleague and direct predecessor as RIFL Faculty Lead, whom they fired for dissent, Professor Johnson refrains from expressing himself on political matters for fear of being subjected to further investigations and termination.

10.    The First Amendment, however, guarantees Professor Johnson's right to express himself, and it forbids the state from mandating that he subscribe to or promote any official ideology. Professor Johnson is entitled to declaratory and injunctive relief securing his First Amendment rights against being "culled" like a disruptive animal for disagreeing with Defendants' political views.

THE PARTIES

11.    Plaintiff Daymon Johnson is employed by the Kern Community College District as a full-time Professor of History at Bakersfield College, a school operated by the Kern Community College District ("KCCD").

12. Defendant Steve Watkin serves as Interim President of Bakersfield College. As such, he is Bakersfield College's chief executive officer, responsible for its administration and policymaking, including the conduct alleged herein. He is sued in his official capacity.

13. Defendant Richard McCrow is the Dean of Instruction at Bakersfield College, and Administrative Co-Chair of the school's Equal Opportunity & Diversity Advisory Committee ("EODAC"). He is sued in his official capacity.

14. Defendant Thomas Burke is the Chancellor of the Kern Community College District. As such, he is the district's chief executive officer, responsible for its administration and policymaking, including the conduct alleged herein. Defendant Burke is sued in his official capacity.

15. Defendant Romeo Agbalog is the President of the Kern Community College District Board of Trustees. He is sued in his official capacity.

16. Defendant John S. Corkins is the Vice President of the Kern Community College District Board of Trustees. He is sued in his official capacity.

17. Defendant Kay S. Meek is the Clerk of the Kern Community College District Board of Trustees. She is sued in her official capacity.

18. Defendant Kyle Carter is a member of the Kern Community College District Board of Trustees. He is sued in his official capacity.

19. Defendant Christina Scrivner is a member of the Kern Community College District Board of Trustees. She is sued in her official capacity.

20. Defendant Nan Gomez-Heitzenberg is a member of the Kern Community College District Board of Trustees. She is sued in her official capacity.

21. Defendant Yovani Jimenez is a member of the Kern Community College District Board of Trustees. He is sued in his official capacity.

STATEMENT OF FACTS

*The regulatory regime*

22. California Education Code § 87732 provides that "[n]o regular employee or academic employee shall be dismissed except for one or more of the following causes: (a) Immoral or

unprofessional conduct; (b) Dishonesty; (c) Unsatisfactory performance; (d) Evident unfitness for service; . . . (f) Persistent violation of, or refusal to obey, the school laws of the state or reasonable regulations prescribed for the government of the community colleges by the board of governors or by the governing board of the community college district employing him or her."

23.   The governing board of a community college district may terminate an employee for "unprofessional conduct" or "unsatisfactory performance" upon 90 days' notice, if the employee does not reform his or her alleged deficiencies. Cal. Educ. Code § 87734.

24.   The governing board of a community college district may also immediately suspend an employee and terminate that employee within 30 days, unless the employee requests a hearing, upon the board's receipt or formulation of charges alleging "immoral conduct" or "willful refusal to perform regular assignments without reasonable cause, as prescribed by reasonable rules and regulations of the employing district." Cal. Educ. Code § 87735.

25.   The KCCD trustees will not penalize or dismiss an employee without receiving a recommendation from the Chancellor. KCCD Board Policy 7360.

26.   KCCD Board Policy 3050 ("BP 3050") "requires that [faculty] conduct [them]selves with civility in all circumstances of [their] professional lives." While the Board "encourages" free expression, it "expect[s] all expressions of content to be conducted in a manner respectful of persons." BP 3050 further claims that KCCD "do[es] not participate in or accept, condone, or tolerate physical or verbal forms of aggression, threat, harassment, ridicule, or intimidation," but the policy does not define those terms.

27.   California's community college system, of which the Kern Community College District is a constituent part, is committed to "embracing diversity:" "[T]he California Community Colleges embrace diversity among students, faculty, staff and the communities we serve as . . . a call to action for a better future." Cal. Code Regs. tit. 5, § 51201(a). This commitment "guide[s] the administration of all programs in the California Community Colleges, consistent with all applicable state and federal laws and regulations." *Id.* § 51200.

28.   Accordingly, "anti-racism" is an official operative ideology of the district: "Embracing diversity means that *we must intentionally practice* acceptance, *anti-racism*, and respect towards

1  one another and understand that racism, discrimination, and prejudices create and sustain privileges

2  for some while creating and sustaining disadvantages for others." *Id.* § 51201(b) (emphasis added).

3      29.  The California Community Colleges define an "anti-racist" as one who "understand[s]

4  that racism is pervasive and has been embedded into all societal structures." *Diversity, Equity and*

5  *Inclusion Glossary of Terms*, California Community Colleges Chancellor's Office,

6  https://perma.cc/T22V-V866 at 1 (last visited May 7, 2023). Anti-racists "challenge the values,

7  structures, policies, and behaviors that perpetuate systemic racism" and are "also willing to admit

8  the times in which they have been racist." *Id.* Anti-racism holds that "[p]ersons that say they are

9  'not a racist' are in denial of the inequities and racial problems that exist." *Id.*

10      30.  "Practicing antiracism requires constantly identifying, challenging, and upending

11  existing racist policies to replace them with antiracist policies that foster equity between racial

12  groups." *Id.*

13      31.  Moreover, "embracing diversity" requires "acknowledg[ment] that institutional racism,

14  discrimination, and biases exist," and a commitment to "eradicat[ing] these from our system," to

15  "strive to eliminate those barriers to equity." Cal. Code of Regs. tit. 5, § 51021(c). It requires "that

16  we act deliberately to create a safe, inclusive, and anti-racist environment . . . ." *Id.*

17      32.  Advancing these goals "requires that we develop and implement policies and

18  procedures, encourage individual and systemic change, continually reflect on our efforts, and hold

19  ourselves accountable for the results of our efforts in accomplishing our goals. In service of these

20  goals, the California Community Colleges are committed to fostering an anti-racist environment

21  that offers equal opportunity for all." *Id.* § 51021(d).

22                          *The ideological divide at Bakersfield College*

23      33.  Professor Johnson began his employment with Bakersfield College in its Department

24  of History in 1993. He currently teaches numerous history courses, including classes in U.S. History

25  and European Civilization.

26      34.  In addition to his role as a faculty member, Professor Johnson is also the Faculty Lead

27  for the Renegade Institute for Liberty ("RIFL"), a group in which he has long been active. RIFL is a

28  sanctioned organization within Bakersfield College comprised of faculty members dedicated to the

pursuit of free speech, open inquiry and critical thinking. RIFL aims to promote and preserve freedom of thought and intellectual literacy through the open discourse of diverse political ideas with an emphasis on American ideals and western historical values.

35.    RIFL represents a minority position on campus. Its members' outlook and ideals stand in general opposition to those espoused by many faculty members and members of the school administration, which is aligned with Section 51201's mandate to "embrace diversity" by, among things, "intentionally practic[ing] . . . anti-racism."

36.    Defendants have made clear their ideological orientation and seek to impose it on college district faculty. On December 8, 2022, then-Bakersfield College President Zav Dadabhoy emailed the entire Bakersfield College community what began as a holiday greeting, but which quickly devolved into a political declaration attacking RIFL. A true and correct copy of this email is attached hereto as Exhibit A.

37.    President Dadabhoy claimed that unidentified "members of BC's communities of color, and LGBTQ community, have shared that many do not feel peace on our own campus. It has been disheartening to see attacks on members of our campus, especially those who already feel marginalized." Exh. A. Dadabhoy did not describe the "attacks" that he saw, but he nonetheless declared, "I am reinforcing my commitment to the College's core values." *Id.*

38.    Dadabhoy declared that "while there may be a small group promoting exclusion, that is not a value of this institution." *Id.* He then declared that Cal. Code Regs. tit. 5, § 51201 "provides us with direction on diversity, equity and inclusion," and in particular, "[w]hat really resonates with me is subsection (b)," which he proceeded to quote in full. *Id.*

39.    Dadabhoy added, "We must not allow the discontent or views of a few to supersede *what we are required* to provide at our college and the work that we have *intentionally developed* to support all members of the community. This is reminder that *we are all tasked* with this work." *Id.* (emphasis added).

40.    Four days later, on December 12, 2022, the topic of RIFL and its members arose at the Kern Community College District Board of Trustees' meeting. At that meeting, Defendant Corkins termed faculty holding minority political views "abusive," and made the aforementioned statement

comparing them to defective livestock "that we have to continue to cull" by "put[ting] a rope on some of them and tak[ing] them to the slaughterhouse." He added, "We've got to get the bad actors out of the room. It really bothers me the bad actors are paid staff and faculty."

41.    None of the other Defendant trustees disavowed Corkins' call to take RIFL members to the "slaughterhouse." Defendant Nan Gomez-Heitzeberg chuckled heartily at the suggestion. Others smiled.

42.    In this atmosphere, ideologically fueled controversies between RIFL members and their opponents are common. Professor Johnson is no stranger to these controversies.

*Bakersfield College investigates and threatens Professor Johnson*
*for disagreeing with a colleague on Facebook*

43.    On August 22, 2019, Bakersfield College Professor Andrew Bond posted the following on his personal Facebook page:

> Maybe Trump's comment about shithole countries was a statement of projection because honestly, the US is a fucking piece of shit nation. Go ahead and quote me, conservatives. This country has yet to live up to the ideals of its founding documents.

44.    Around May 2021, Professor Johnson reposted Bond's post on RIFL's Facebook page, and added, "Here's what one critical race theorists at BC sounds like. Do you agree with this radical SJW from BC's English Department? Thoughts?"

45.    Professor Johnson then used his personal Facebook account to comment on what he had reposted:

> Maybe he should move to China, and post this about the PRC in general or the Chinese Communist Party and see how much mileage it gets him. I wonder, do they still send the family the bill for the spent round?

46.    In the course of pursuing an administrative complaint against RIFL's then-Faculty Lead, Professor Matthew Garrett, Professor Bond learned that Professor Johnson had reposted Bond's post on RIFL's Facebook page. Accordingly, on September 24, 2021, Professor Bond filed an administrative complaint against Professor Johnson for harassment and bullying over the Facebook post and commentary. Professor Johnson was not allowed to see a copy of the complaint.

47.    Rather than dismiss Bond's complaint out of hand, the Kern Community College District subjected Professor Johnson to an investigation that necessitated his retention of counsel. Finally, on February 23, 2022, five months after Bond's complaint, President Dadabhoy sent Professor Johnson the district's administrative determination of Bond's complaint against him.

48.    Dadabhoy communicated the district's determination that Professor Johnson's conduct presented no cause for discipline. In doing so, however, the district saw fit to pass judgment on each of 29 separate allegations raised in the dispute, including that Professor Garrett "liked" Professor Johnson's comment (allegation 2, sustained), that Professor Johnson's posting doxed Bond (allegation 3, "not sustained but plausible"), and that "Professor Bond was offended that Professor Johnson described his personal views incorrectly. Professor Johnson admitted he would also be offended in a similar situation" (allegation 14, sustained). A true and correct copy of that determination is attached hereto as Exhibit B.

49.    Notably, although the district's investigation "revealed no evidence that Dr. Johnson took any of these actions in his role as a Kern Community College District employee," the district also determined that it "will investigate any further complaints of harassment and bullying and, if applicable, will take appropriate remedial action including but not limited to any discipline determined to be appropriate." Exh. B at 8.

*Bakersfield College punishes professors*
*for lecturing about free speech*

50.    On September 12, 2019, Professor Garrett delivered a public lecture on the Bakersfield College campus entitled, "The Tale of Two Protests: Free Speech and the Intellectual Origins of BC Campus Censorship," at which he was introduced by fellow Professor Erin Miller.

51.    On information and belief, Professors Bond and Oliver Rosales filed administrative complaints against Garrett and Miller over the September 12, 2019 lecture. The school subsequently made an administrative determination that Garrett and Miller's speech at the lecture constituted "unprofessional conduct," and threatened further discipline against them. This prompted Garrett and Miller to sue school officials for violating their First Amendment rights. *Garrett v. Hine*, U.S. Dist. Ct., Eastern District of California, No. 1:21-cv-00845.

*Bakersfield College terminates RIFL's previous*
*Faculty Lead for expressing disapproved political views*

52.    On November 21, 2022, Defendant McCrow issued Professor Garrett a 90-day notice pursuant to Cal. Educ. Code § 87734 "to correct your performance deficiencies involving unprofessional conduct," which would enable the Kern Community College District to "initiat[e] formal disciplinary proceeding for dismissal on the grounds of unprofessional conduct." The notice further provided that Garrett could be charged with "unsatisfactory performance," and violation of BP 3050. A true and correct copy of the notice (home address redacted) is attached hereto as Exhibit C.

53.    Per Defendant McCrow, Professor Garrett's alleged acts of "unprofessional conduct," "unsatisfactory performance," and violations of BP 3050 warranting termination, included:

a.  "Disregard[ing] the impact of [an] attack" consisting of the posting of political stickers and "[taking] issue with BC's characterization of the stickers as 'hate speech' and 'vandalism'" by authoring an op-ed piece in the *Bakersfield Californian*. Exh. C at 1, ¶ 1. The op-ed was grounds for termination because of its characterization of the sticker protestors, and the fact that Garret was "critical of BC's characterization of the stickers and suggested that their content was protected by the First Amendment." Garrett even "went further to suggest that certain terms like 'Cultural Marxism' weren't 'hate speech' but instead speech that challenges a dominant agenda on campus, i.e. the social justice movement," *id.*;

b.  Opining that Bakersfield College's Equal Opportunity & Diversity Advisory Committee (EODAC) "has been consistently staffed by the administration with faculty who hold one particular point of view," *id.* at 2, ¶ 4c (quoting Garrett);

c.  Criticizing the EODAC Chair's conduct at a meeting, *id.* at 2-3, ¶ 5;

d.  Providing a public comment on the Bakersfield College's Curriculum Committee proposal of two history courses stating, in opposition, that the courses were the equivalent of a "high school field trip" and "openly partisan training for children," *id.* at 3, ¶ 6;

e. Causing "very real harm" to students based on three student allegations: first, an unexplained assertion that Garrett was a racist who would fail students based on their skin color; second, the fact that a different professor whispered something in Garrett's ear; and third, that Garrett allegedly "insult[ed] [another professor] and her way of teaching," which purportedly made the student feel unsafe, *id.* at 4-5, ¶ 11;

f. Expressing opinions on a local radio show including that sociology, ethnic studies, anthropology are producing bad information and poor narratives grounded in history; that diversity trainings are just ways to figure out how to legally discriminate; and "[c]laim[ing] that Bakersfield College staff are trying to quiet [Garrett]," *id.* at 5, ¶ 12;

g. "[R]epeatedly fail[ing], as the Faculty Lead for the Renegade Institute for Liberty, to restrict" criticism of the District and faculty "on RIFL's social media" that McCrow alleged to be "baseless," *id.* at 6, ¶ 13; and

h. Using his social media account to express critical opinions of the school and faculty, including statements such as, "[a]s a public institution their financials should be open to public criticism," *id.* ¶ 14 (quoting Garrett).

54. For each example of "unprofessional conduct," Defendant McCrow asserted that Professor Garrett's opinions and statements were "demonstrably false." But neither the 90-day notice letter nor its attachments contained any actual demonstration of falsehood.

55. In summing up his accusations against Professor Garrett, Defendant McCrow stated, "Importantly, you caused students to feel unwelcome and unsafe by belittling the community's valid concerns." Exh. C at 7. In other words, per Defendant McCrow, students at Bakersfield are unable to tolerate speech with which they disagree, and faculty should be terminated if they criticize views that "the community" deems "valid." "Invalid" views that contradict the community are punishable.

56. Defendant McCrow went on to stress that Garrett's speech harmed the school's reputation, and that Garrett should not have expressed his concerns about the school publicly.

"These actions demonstrated a lack of professional judgment by making your accusations loudly and improperly, instead of determining the proper channels for grievances. Consequently, your public accusations invited outrage from your colleagues and the community at large." *Id.*

57.   Defendant McCrow also asserted that Garrett's criticism of staff serving on committees "has caused many employees to cease their committee work" for fear of being criticized. And Garrett's "attacks on the Curriculum Committee, its members, and its important work, meant that many pieces of curriculum were in danger of not being approved." *Id.*

58.   McCrow therefore commanded Professor Garrett, apparently with respect to his public political and ideological speech, "You will not substitute your own judgment for the judgment of your supervisor or other administrators." *Id.*

59.   McCrow also directed Professor Garrett, "You will address grievances and complaints to appropriate college administrators," meaning that he should refrain from publicly airing his grievances and complaints. *Id.* at 8.

60.   And McCrow also removed Professor Garrett from the Equal Opportunity and Diversity Advisory Committee. *Id.*

61.   Upon receiving the 90-day notice letter, Professor Garrett resigned as Faculty Lead for RIFL. Professor Johnson immediately succeeded him in that role.

62.   On April 11, 2023, President Dadabhoy formally recommended to Defendant Trustees Agbalog, Corkins, Meek, Carter, Scrivner, Gomez-Heitzberg, and Jimenez that they terminate Professor Garrett's employment by issuing a "Statement of Charges and Recommendation for Statement of Decision to Terminate." Defendant Burke's predecessor in office, former Chancellor Sonya Christian, concurred in Dadabhoy's recommendation.

63.   On April 13, 2023, the Defendant Trustees found cause for Garrett's termination as set out by President Dadabhoy and Chancellor Christian, and fired Professor Garrett.

64.   On April 14, 2023, Dadabhoy sent Professor Garrett a letter notifying him of his termination, which included the "Statement of Charges and Recommendation for Statement of Decision to Terminate." A true and correct copy of that letter (home address redacted) and the accompanying statement of charges and recommendation is attached hereto as Exhibit D.

65.   The "Statement of Charges" recounted the allegations of the 90-day notice letter, and declared that Garrett failed to follow that notice's directives to cure his allegedly deficient job performance. Exh. D at 13, ¶ 7.

66.   The "Statement of Charges" then added that Garrett:

a.   "[D]eliberately mischaracterized a Bakersfield College student housing initiative as 'not student dorms' and as 'low income housing,'" and by "printed and distributed a flyer" criticizing the project "as threatening the neighborhood with loud parties, safety issues, crime, crowded daily parking issues, overflow of parking for events, and decrease in property values." Exh. D at 13, ¶ 8 (internal punctuation omitted);

b.   Alleged that the District failed to explain why his conduct was unprofessional, *id.* at 14, ¶ 9;

c.   Asked Dean McCrow for clarification of the 90-day notice allegations, but did not make his request "in good faith and [thereby] again demonstrate[d] unprofessionalism," *id.* ¶ 10;

d.   Provided an interview for Fox News Digital in which he criticized Bakersfield College's "affirmative action-type behavior," "allegations [that] demeaned, demoralized, and disrespected the College's employees and its students," *id.* ¶ 11a;

e.   "Prompted" − merely by virtue of the interview he gave – third-party comments on social media that were critical of Bakersfield College and its students, *id.*;

f.   Posted a link to his Fox News Digital interview on the RIFL Facebook page, and "continued to permit the RIFL Facebook page to post" criticism of the school and its faculty, which Dadabhoy and Christian asserted were "false and baseless attacks," *id.* at 15, ¶ 11b;

g.   Emailed a *Daily Wire* article about the school to another person, *id.* ¶ 11c, and shared the article on his social media, *id.* at 16, ¶ 11e;

h.   Criticized a faculty member for inciting students against him in an interview with *Inside Higher Ed*, *id.* at 15, ¶ 11d; and

i. Engaged in "ongoing public attacks [that] demonstrate[d] Garrett's continued refusal to engage in civil, honest discourse or to direct complaints to the appropriate college administrator as directed by the 90-day notice." *Id.* at 16.

67. President Dadabhoy and Chancellor Christian further charged Garrett with publishing an open letter to the Defendant Trustees in which he criticized them without sufficient rationale or evidence. For example, Garrett criticized Defendant Corkins's equation of dissenting faculty to defective cattle by alleging that "Trustee Corkins may not be familiar with administrative 'extrajudicial punishments' because the Trustee is a 'rural cattle guy.'" *Id.* at 17, ¶ 14e.

68. Indeed, President Dadabhoy and Chancellor Christian charged Garrett with a number of additional offenses comprising of political speech. For example, Garrett "attacked his colleagues through the RIFL Facebook post: 'Can you count how many times BC's Communication Dept professors imply accusations of racism, sexism, and classism to advance their agenda in the recent Feb 15 Academic Senate meeting?'" *id.* at 19, ¶ 19; posted a link to an article in *Just the News* critical of the school on the RIFL Facebook page, *id.* ¶ 20; and also, on RIFL's Facebook page, "accused the KCCD district of financial mismanagement," *id.* ¶ 21.

69. Per Defendants, Garrett's political speech amounted to:

a. Immoral or unprofessional conduct (Cal. Educ. Code, § 87732, subd. (a), Cal. Educ. Code, § 87735);

b. Dishonesty (Cal. Educ. Code, § 87732, subd. (b));

c. Unsatisfactory performance (Cal. Educ. Code, § 87732, subd. (c));

d. Evident unfitness for service (Cal. Educ. Code, § 87732, subd. (d));

e. Persistent violation of, or refusal to obey, the school laws of the state or reasonable regulations prescribed for the government of the community colleges by the board of governors or by the governing board of the community college district employing him or her (Cal. Educ. Code, § 87732, subd. (f)); and

f. Willful refusal to perform regular assignments without reasonable cause, as prescribed by reasonable rules and regulations of the employing district. (Cal. Educ. Code, § 87735).

*Defendants' adoption and enforcement of an*
*Official ideology chills Professor Johnson's speech*

70.     Considering his experience of being investigated by Defendants over his Facebook posts, Defendants' adoption of an official political ideology that he rejects, Defendants' treatment of his colleague and predecessor in the position of Faculty Lead for RIFL, and indeed, his responsibility for some of the speech for which Professor Garrett was fired, Professor Johnson refrains from expressing his political views and from freely participating in the intellectual life of the college for fear that Defendants would investigate, discipline, and ultimately terminate his employment on the basis of his viewpoints.

71.     Defendants' administrative determination of Professor Bond's complaint about Professor Johnson's Facebook posts confirmed to Professor Johnson that Bond, or others who disagree with him, can easily trigger formal investigations of his political speech, which can cause him to be disciplined and ultimately terminated.

72.     Professor Johnson shares many of Professor Garrett's conservative political views and social values, which Defendants have already proven they will censor and punish. For instance, Professor Johnson, like Professor Garrett, does not agree with Bakersfield College's apparent definition of "hate speech," and believes that what is often considered "hate speech" by some is nonetheless speech protected by the First Amendment.

73.     Recalling that Defendants terminated Professor Garrett in part for his defense of the term "cultural Marxism," Professor Johnson can identify 18 posts on RIFL's Facebook page that reference the phrase. Professor Johnson posted 15 of these himself. In every instance "cultural Marxism" refers to the present-day social justice agenda, is in no way defending or promoting "hate speech" as Professor Johnson understands it, and, in any event, is speech protected by the First Amendment that communicates Professor Johnson's viewpoints. Several of these posts, in fact, connected the phrase "Cultural Marxism" to Bakersfield College's social justice agenda, which Professor Johnson opposes.

74.     After Professor Johnson learned that publicly disagreeing with Defendants' anti-racist definition of the term "cultural Marxism" was a fireable offense, he cancelled a RIFL community

event scheduled for July 7, 2023, at which RIFL's guest speaker, theologian Voddie Baucham, had been invited to speak on cultural Marxism, academia, and its impact on churches. Professor Johnson feared that allowing this speech to go forward – and having to defend cultural Marxism as a speaker topic − would lead to his discipline or termination, just as Professor Garrett's use of the term in a Bakersfield Californian op-ed let to his termination.

75.    Professor Johnson is currently in charge of arranging speakers for the next school year (Fall 2023). Each of the speakers Johnson was planning to invite on behalf of RIFL would present viewpoints that Defendants have already condemned, including in the course of disciplining Garrett. As such, Professor Johnson has refrained from finalizing agreements with the speakers for fear of discipline and termination.

76.    Professor Johnson also wrote a letter to the Curriculum Committee for Public Comment regarding the same two history courses Professor Garrett criticized, a type of speech he is reticent to engage in again. In fact, the very RIFL Facebook posts that Defendants attributed to Professor Garrett, and for which they terminated him, were actually posted by Professor Johnson.

77.    Indeed, multiple post-November 2022 RIFL Facebook postings that Defendants cite to as examples of Professor Garrett's unprofessional conduct were, in fact, made by Professor Johnson, who had already taken over as Faculty Lead at that time and was the Facebook page's administrator.

78.    As a result of Professor Garrett's discipline and termination for these posts, Professor Johnson has since refrained from making posts or expressing opinions similar to Professor Garrett's, via the RIFL Facebook page or his own personal social media accounts. Instead, Professor Johnson has assigned the task of posting on RIFL's Facebook page to two retired professors who cannot be disciplined by Defendants for their speech.

79.    Considering that Professor Garrett was terminated in part because students disapproved of his speech, and even of speech that another professor spoke to him, Johnson must endeavor not to offend students' sensitivities if he wishes to keep his job. Specifically, Professor Johnson must now refrain from expressing viewpoints – similar to Garrett's – that students are being weaponized by the EODAC to push DEI ideology agendas so, that he can avoid termination.

80. Although he replaced Professor Garrett on the EODAC, Professor Johnson has stopped attending EODAC meetings. He, like Professor Garrett, has concerns about "reverse" racism and deceptive ways the committee was pushing affirmative action. Because his expression of those concerns could be characterized as "demonstrably false" and form a basis for termination, Professor Johnson avoids expressing those concerns altogether.

81. Defendants' use of Professor Garrett's commentary in media interviews as a reason for discipline also chills Professor Johnson's speech. Professor Johnson was recently asked to appear on the same radio show as Professor Garrett, but he turned down the offer for fear of making a statement that Defendants would claim to be "unprofessional" and grounds for termination.

82. It was very clear to Professor Johnson, upon reading President Dadabhoy's December 8 email, that Dadabhoy's reference to "a small group promoting exclusion" was directed at RIFL members, of which he was the Faculty Lead. RIFL members' speech, including Professor Johnson's, had consistently been the target of suppression, intimidation, and censorship by other Bakersfield College faculty members. These attempts were always made under the guise of pursuing "diversity," with RIFL's detractors typically labelling any speech they disagreed with as "racist" or "homophobic." President Dadabhoy's email followed upon this pattern.

83. Professor Johnson's conscience does not allow him to believe in and practice the "antiracism" ideology as required by Cal. Code of Regs. tit. 5, § 51201. He does not believe that racism is pervasive and systemically embedded into all societal structures – particularly Bakersfield College – and thus he does not wish to challenge the values, structures, policies, and behaviors that, according to others, allegedly perpetuate systemic racism. Johnson does not believe he is racist, and he is not in denial of anything in asserting that. He does not wish to constantly identify, challenge, upend, and replace existing policies.

84. Not only does Professor Johnson disagree with the tenets of antiracism that the ideology requires one to uphold and affirm, but Johnson also believes that his political viewpoints, which he would like to express, are inconsistent with and even defiant of anti-racist ideology.

85. But considering President Dadabhoy's expressed commitment to the mandate of Cal. Code of Regs. tit. 5, § 51201, Dadabhoy's connection of that regulation to his opposition to RIFL,

and Defendants' subsequent termination of Garrett for expressing views that are at least
incompatible with antiracism, Professor Johnson curtails his own speech so as not to run afoul of
Section 51201 and thereby risk discipline and termination.

## COUNT I
### FIRST AMENDMENT RIGHTS OF FREE SPEECH AND PETITION, 42 U.S.C. § 1983
### AS-APPLIED CHALLENGE TO CAL. EDUC. CODE §§ 87732 AND 87735

86.    Plaintiff realleges and incorporate paragraphs 1 through 85 of this complaint.

87.    Professor Johnson's speech regarding political and social issues, including his speech
about Bakersfield College and its preferred ideologies, criticism of other faculty and administrators,
and his advocacy and expression related to RIFL, all constitutes speech on matters of public
concern and petition protected by the First Amendment. And to the extent that Professor Johnson
speaks about academic affairs on campus, his doing so is part and parcel of his traditional role as a
community college professor.

88.    The First Amendment also secures Professor Johnson's right to present his views in
the ways that he chooses, including his choice of words and images, regardless of whether others
would find his speech disagreeable or offensive.

89.    In addition, or in the alternative, Professor Johnson also has a right to engage in the
speech at issue in this case as part of his right to academic freedom and as a participant in the
dialogue about university affairs.

90.    Defendants consider the expression of political and social viewpoints that they reject to
constitute grounds for investigation, discipline, and termination as "immoral or unprofessional
conduct," "dishonesty," "unsatisfactory performance," "evident unfitness for service," "persistent
violation of, or refusal to obey" laws or regulations, under Cal. Educ. Code § 87732; and "willful
refusal to perform regular assignments" under Cal. Educ. Code § 87735.

91.    Professor Johnson intends to continue speaking on political and social issues, but
considering that Defendants have already investigated him for such speech, stated that they would
conduct such investigations in the future, declared their hostility to Johnson's viewpoints,
committed to the implementation of Cal. Code of Regs. tit. 5, § 51201, and terminated Johnson's
RIFL predecessor for expressing the same and similar views, Johnson refrains from speaking and

1   has altered his speech for fear of further investigation, discipline, and termination by Defendants

2   under Cal. Educ. Code §§ 87732 and 87735.

3   92.   By applying Cal. Educ. Code §§ 87732 and 87735 against the expression of protected

4   speech on the basis of viewpoint, Defendants, under color of law, violated and continue to violate

5   Professor Johnson's rights of free speech and petition under the First and Fourteenth Amendment to

6   the United States Constitution.

7   93.   Accordingly, Defendants injured and continue to injure Professor Johnson in violation

8   of 42 U.S.C. § 1983, and Professor Johnson is entitled to declaratory and preliminary and

9   permanent injunctive relief against continued enforcement and maintenance of Defendants'

10   unconstitutional customs, policies; and attorney fees and expenses under 42 U.S.C. § 1988.

11

12   COUNT II
FIRST AMENDMENT RIGHTS OF FREE SPEECH AND PETITION, 42 U.S.C. § 1983
AS-APPLIED CHALLENGE TO KCCD BOARD POLICY 3050

13   94.   Plaintiff realleges and incorporate paragraphs 1 through 89 of this complaint.

14   95.   Defendants consider the expression of political and social viewpoints that they reject to

15   constitute grounds for investigation, discipline, and termination as violations of KCCD Board

16   Policy 3050, in that the expression of such viewpoints is uncivil, disrespectful, and constitutes

17   "verbal forms of aggression, threat, harassment, ridicule, or intimidation."

18   96.   Professor Johnson intends to continue speaking on political and social issues, but

19   considering that Defendants have already investigated him for such speech, stated that they would

20   conduct such investigations in the future, declared their hostility to Johnson's viewpoints,

21   committed to the implementation of Cal. Code of Regs. tit. 5, § 51201, and terminated Johnson's

22   RIFL predecessor for expressing the same and similar views, Johnson refrains from speaking and

23   has altered his speech for fear of further investigation, discipline, and termination by Defendants

24   under KCCD Board Policy 3050.

25   97.   By applying KCCD Board Policy 3050 against the expression of protected speech on

26   the basis of viewpoint, Defendants, under color of law, violated and continue to violate Professor

27   Johnson's rights of free speech and petition under the First and Fourteenth Amendment to the

28   United States Constitution.

98.   Accordingly, Defendants injured and continue to injure Professor Johnson in violation of 42 U.S.C. § 1983, and Professor Johnson is entitled to declaratory and preliminary and permanent injunctive relief against continued enforcement and maintenance of Defendants' unconstitutional customs, policies; and attorney fees and expenses under 42 U.S.C. § 1988.

COUNT III
FIRST AMENDMENT RIGHT OF FREE SPEECH AND PETITION, 42 U.S.C. § 1983
FACIAL AND AS-APPLIED CHALLENGE TO CAL. CODE OF REGS. TIT. 5, §§ 51200 AND 51201

99.   Plaintiff realleges and incorporate paragraphs 1 through 85 of this complaint.

100.   The adoption of an official ideology by Cal. Code of Regs. tit. 5, §§ 51200 and 51201 constitutes a blatant form of viewpoint discrimination forbidden by the First Amendment.

101.   Sections 51200 and 51201 also compel speech in violation of the First Amendment.

102.   Demanding that faculty subscribe to and advance a particular creed or political ideology is inconsistent with the mission of a public college.

103.   Professor Johnson is entitled to reject Defendants' vision of "embracing diversity," including the tenets of anti-racist ideology; refuse to approach the world through an anti-racist lens; and express his rejection of anti-racism and its related ideologies; without fear of official retribution.

104.   Defendants consider the expression of political and social viewpoints that they reject to constitute grounds for investigation, discipline, and termination. In light of Defendant Dadabhoy's public calls for compliance with Section 51201 alongside his condemnation of RIFL faculty; and the fact that Defendants have investigated, disciplined, and terminated faculty for expressing views that are incompatible with anti-racism and Defendants' vision of "embracing diversity," Professor Johnson refrains from speaking and is altering his speech for fear of being investigated, disciplined, and terminated for violation of Sections 51200 and 51201.

105.   Sections 51200 and 51201 are unconstitutional both facially and as applied against Professor Johnson. By directing compliance with these provisions, and applying them to bar the expression of protected speech on the basis of viewpoint and to compel speech, Defendants, under color of law, violated and continue to violate Professor Johnson's rights of free speech and petition under the First and Fourteenth Amendment to the United States Constitution.

106.  Accordingly, Defendants injured and continue to injure Professor Johnson in violation of 42 U.S.C. § 1983, and Professor Johnson is entitled to declaratory and preliminary and permanent injunctive relief against continued enforcement and maintenance of Defendants' unconstitutional customs, policies; and attorney fees and expenses under 42 U.S.C. § 1988.

PRAYER FOR RELIEF

WHEREFORE, Plaintiff Daymon Johnson requests that judgment be entered in his favor as follows:

A. Orders preliminarily and permanently enjoining Defendants, their officers, agents, servants, employees, and all persons in active concert or participation with them who receive actual notice of the injunction, from investigating, disciplining, or terminating Professor Johnson by applying Cal. Educ. Code §§ 87732 or 87735, or Kern Community College District Board Policy 3050, based on the content or viewpoint of his social or political speech;

B. Orders preliminarily and permanently enjoining Defendants, their officers, agents, servants, employees, and all persons in active concert or participation with them who receive actual notice of the injunction, from enforcing Cal. Code of Regs. tit. 5, §§ 51200 and 51201, on their face or against Professor Johnson;

C. Declaratory relief consistent with the injunction, to the effect that investigating, disciplining, or terminating Professor Johnson by applying Cal. Educ. Code §§ 87732 or 87735, or Kern Community College District Board Policy 3050, based on the content or viewpoint of his social or political speech, violates his First Amendment rights of free speech and petition;

D. Declaratory relief consistent with the injunction, to the effect that Cal. Code of Regs. tit. 5, §§ 51200 and 51201 violate the First Amendment rights to free speech and petition;

E. Costs of suit;

F. Attorney's fees and expenses pursuant to 42 U.S.C. § 1988; and

G. Any other relief as the Court deems just and appropriate.

Dated: June 1, 2023                Respectfully submitted,

                          By:     /s/ Alan Gura
                                  Alan Gura (SBN 178221)
                                        agura@ifs.org
                                  Courtney Corbello (pro hac vice pending)
                                        ccorbello@ifs.org
                                  INSTITUTE FOR FREE SPEECH
                                  1150 Connecticut Avenue, N.W., Suite 801
                                  Washington, DC 20036
                                  Phone: 202.967.0007
                                  Fax:    202.301.3399

                                  Attorneys for Plaintiff Daymon Johnson